IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37927-2-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JOEL MATTHEW GROVES, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — In 2014, Joel Groves was convicted of first degree

assault, drive-by shooting (with a firearm enhancement), felony harassment, and first

degree unlawful possession of a firearm. In his direct appeal and consolidated personal

restraint petition (PRP), we reversed the firearm enhancement and the felony harassment

conviction, but otherwise affirmed. Since then, Mr. Groves has filed additional PRPs,

which have been rejected.

In July 2020, he filed a motion with the trial court to dismiss his convictions,

asserting discovery violations and governmental misconduct. Specifically, he argued the

State committed misconduct when it consumed (or destroyed) the DNA[1] evidence from

the hammer of the revolver used in the crime and failed to disclose that the profile of the

---

[1] Deoxyribonucleic acid.

DNA destroyed in the testing did not match his Washington CODIS[2] profile.  The trial court denied his motion.

On appeal, Mr. Groves argues the trial court misunderstood the scope of his motion to dismiss.  He asks that we address the merits of his appeal rather than dismiss it on procedural grounds and urges us to remand this matter for a new hearing so the trial court can fully consider his motion.

We could dismiss this appeal on procedural grounds.  But we elect to address its merits because Mr. Groves might continue to appeal these issues and a subsequent court will benefit from a full discussion of the record.

After a thorough review of the record and the arguments raised, we conclude that Mr. Groves's arguments lack merit.  He has not shown that the State failed to disclose material exculpatory evidence: although the DNA evidence on the revolver's hammer was consumed in testing, the DNA profile from the hammer *matched* his Washington CODIS profile.  Thus, the destroyed DNA evidence was not material exculpatory evidence.  We affirm the trial court's denial of Mr. Groves's motion to dismiss.

---

[2] Combined DNA Index System.

FACTS

This appeal involves a swab used to obtain the DNA from the hammer of a revolver, the destruction of that swab, and the State's disclosure of the test results. We begin by summarizing the facts leading to Mr. Groves's arrest. These facts are set forth in greater detail in the unpublished opinion from Mr. Groves's direct appeal. *State v. Groves*, No. 32961-5-III, (Wash. Ct. App. Feb. 23, 2017) (unpublished), https://www.courts.wa.gov/opinions/pdf/329615_ord.pdf, as amended by order filed May 16, 2017.

*Facts leading to arrest*

In the summer of 2014, Mr. Groves was dating Cathy Sampson. Her adult son, Zach Koback, claimed that "Dizzy" Kessay had insulted his mother. At Mr. Groves's urging, Mr. Koback agreed to confront Dizzy. Mr. Groves drove Mr. Koback and Jordan Hanson to an apartment where Dizzy lived. While the two younger men approached the apartment, Mr. Groves remained in the car. Mr. Koback pounded on the door. Dizzy retrieved a gun and met the two younger men at the door. Dizzy noticed that neither Mr. Koback nor Mr. Hanson had a gun. Mr. Koback then exclaimed that Dizzy had a gun. Dizzy opened the door wider and saw that the older man was standing near the car with a large black revolver.

3

One witness heard the older man say, "'Dizzy, I got something for you.'" *Groves*, No. 32961-5-III, slip op. at 4. Dizzy slammed the door as the older man fired the gun. The bullet went through the door and struck the oven in the apartment. The two younger men then dove into Mr. Groves's car. Mr. Groves handed the gun to Mr. Koback and asked him to hide it. Mr. Groves later got the gun back from Mr. Koback.

A witness identified Mr. Groves as the shooter. On July 10, 2014, the State charged Mr. Groves with first degree assault, drive-by shooting, and felony harassment. It later added a charge of first degree unlawful possession of a firearm.

On August 11, 2014, Ms. Sampson asked a neighbor to haul a trailer full of garbage to the dump. On the way to the dump, the neighbor noticed a revolver in one of the bags and alerted law enforcement. The revolver was a single action Ruger, which required the hammer to be pulled back to fire a shot.

Soon after, Mr. Groves admitted to a detective that he drove the two younger men to Dizzy's apartment, but claimed that Mr. Koback had fired the revolver. The question of who fired the revolver would be the central issue at trial.

*DNA testing of the revolver*

The State obtained numerous pieces of physical evidence from the crime,

including the Ruger revolver, item QQ.[3]

On August 12, 2014, the revolver and other items arrived at the Washington State

Patrol Crime Laboratory (crime lab). Technical forensic scientist Amy Jagmin was

assigned to complete the DNA testing for the case. On August 12, 2014, local law

enforcement signed an authorization to consume (destroy) DNA evidence, as needed.

On September 15, 2014, Ms. Jagmin e-mailed Detective Tim Weed for instructions

on what testing he wanted her to do. The detective overlooked the e-mail and did not

respond.

On October 13, 2014, the trial court granted the State's motion to continue the trial

date based on outstanding DNA evidence and analysis. Over Mr. Groves's objection, the

court continued the trial date to November 4. The last day of Mr. Groves's speedy trial

period was November 10.

---

[3] Throughout his brief, Mr. Groves refers to item QQ as the swab of the revolver's hammer. Our review of the record shows that item QQ is the revolver itself. *See* Clerk's Papers (CP) at 398 ("Evidence Bag E14-08573 No. QQ Ruger new model Blackhawk .357 magnum"); CP at 216 (lists item QQ as "Ruger Blackhawk located in garbage at suspect's estranged girlfriend's house"); CP at 237 ("No blood was detected on the revolver (QQ).").

On October 20, 2014, Ms. Jagmin again e-mailed Detective Weed and asked whether it was possible to get a suspect reference sample to aid in the DNA analysis. Detective Weed responded that Mr. Groves was in custody and a sample could be obtained with a warrant. Ms. Jagmin stated that the DNA testing had not yet begun but asked whether there was a court date she should be aware of. Detective Weed answered, "November 4." Clerks Papers (CP) at 214.

*Matching the DNA from the hammer to Mr. Groves's Washington CODIS profile*

On October 23, 2014, Ms. Jagmin obtained DNA from different areas of the revolver. The swab of the hammer resulted in a mixed profile of two people. An October 23 report initialed by Ms. Jagmin showed that the DNA from all of the swabs had been consumed and the tubes discarded.

On October 30, the crime lab found a match between the DNA on the hammer and a convicted offender's profile from the state level CODIS. More precisely, the match detail report showed a match of 16 short tandem repeat (STR) loci, indicating a "high" degree of probability that the DNA on the hammer matched the DNA from convicted offender ID # 107-031507. CP at 226. That same day, Ms. Jagmin sent a DNA match request to the crime lab requesting the recipient to confirm if there was a match. The request noted that the major DNA on the hammer matched ID # 107-031507 and listed

6

Mr. Groves as the suspect. A national match detail short report dated October 30, 2014, noted a match of 13 STR loci between the DNA on the hammer and a convicted offender identified by a national data base number, but not by name.

On October 31, 2014, the trial court presided over a hearing on the State's motion to obtain a buccal swab. The State explained that it had been trying to get the DNA analysis done as quickly as possible but having a sample from Mr. Groves would yield quicker results. Mr. Groves objected on the basis that his DNA was already in the CODIS system. The court granted the motion. After the hearing, two buccal swabs were collected from Mr. Groves and sent to Ms. Jagmin for testing.

On November 3, Mr. Groves moved to suppress the forthcoming DNA evidence. He argued that the results were still unknown to him and, with trial set to begin the following day, he had no chance to review them or hire an expert to do so. The State argued that all parties knew that the revolver would be tested for DNA evidence and it had been working diligently with the crime lab to get the analysis. The State anticipated the results would be available within the next few days and stated it intended to use those results in its case in chief. The prosecutor explained, "[T]here is a testable DNA sample on the hammer. . . . [I]t may have hit in CODIS on the defendant's DNA, but they asked

7

for that buccal swab . . . to be able to come to a conclusion today . . . ."  Report of

Proceedings (July 28; Aug. 29; Oct. 3, 10, 13, 16 & 31; Nov. 3 & 7, 2014) (RP) at 132.

The trial court asked Mr. Groves to explain why the remedy would not be a

continuance rather than suppression.  Groves argued he was forced to choose between his

right to a speedy trial and his right to effective representation.  He reiterated he did not

want a continuance; he wanted suppression of the evidence because it had not been timely

provided.

The trial court reasoned that there may not even be any evidence to suppress, only

an indication of a match; therefore, the motion was premature.  The court found there was

no dilatory conduct on the part of the prosecution.  Mr. Groves disagreed and argued the

State had taken three months to get the testing done.  The following exchange then took

place:

> THE COURT:  . . .  [I]f we start from the proposition that there has
> not been any kind of mismanagement . . . are you telling me that you want
> to go to trial tomorrow, and—take your chances with the DNA evidence, —
> [THE DEFENSE]:  Well, —
> THE COURT:  —(inaudible)?
> [THE DEFENSE]:  Yes.
> THE COURT:  That's what you're telling me.  So . . . if the DNA
> evidence comes in in the middle of the trial, they've got your client's DNA
> on the hammer, . . . you're going to want to . . . proceed with trial rather
> than—have a continuance of the case.

[THE DEFENSE]: . . . I would have to reserve the right to ask for a mistrial. But my client's indicating very emphatically—that we definitely are ready to go.

RP at 148. The trial court granted the State's motion for a continuance over Mr. Groves's objection.

On November 4, 2014, the crime lab sent a CODIS DNA match report to Ms. Jagmin, confirming that the DNA on the hammer matched convicted offender ID # 107-031507, the same number listed in Ms. Jagmin's earlier report. In addition, the crime lab match report showed that convicted offender ID # 107-031507 belonged to the defendant, Joel Groves, date of birth of December 10, 1964.[4]

*Matching the DNA on the hammer to the DNA taken from Mr. Groves*

On November 5, 2014, Ms. Jagmin wrote a case file report, which concluded in relevant part:

A mixed DNA typing profile consistent with originating from at least two people was obtained from the swab of the hammer of the revolver (QQ). *A major male profile was present and matched the DNA typing profile obtained from Joel M. Groves* (GGG). The estimated probability of selecting an unrelated individual at random from the US population with a matching profile is 1 in 2.7 sextillion. Trace DNA of limited genetic information was also detected.

---

[4] We provide this detail to refute Mr. Groves's assertions in this appeal that the DNA on the revolver's hammer was never shown to match his state CODIS profile.

9

CP at 237 (emphasis added).

Under the sections entitled "<u>Remarks</u>," the report stated:

The major profile from the hammer of the revolver (QQ) was uploaded to and searched against the state level of the Combined DNA Index System (CODIS) database, *and no probative matches resulted.*[5]  The profile will be searched against the national level of the CODIS database at a future date.  If any probative matches occur, an additional report will be provided.

CP at 237 (emphasis added).

On November 7, Mr. Groves again moved to suppress the DNA evidence from the revolver, arguing he did not have sufficient time to verify the new DNA results. He argued additional testing was required because more than one person's DNA was identified on the hammer.  The trial court denied the motion, again finding no dilatory conduct on the part of the State, but stated it would grant a continuance so that Mr. Groves could get additional testing.

*Trial*

Mr. Groves declined the court's invitation for a continuance and proceeded to a jury trial.  The State's witnesses testified consistent with the background facts summarized earlier.  In addition, Ms. Jagmin testified that she obtained a robust profile on

---

[5] Mr. Groves misinterprets this phrase to mean "no matches resulted."  Ms. Jagmin later clarified why the earlier CODIS matches were not "probative."

the revolver's hammer, which the user needed to pull back to cock the gun.  She

determined there was a mixture of two people's DNA on the hammer.  Of the two, there

was one major profile and a trace profile of someone else.  She compared the major

profile to Mr. Groves's reference sample and concluded they matched.

The jury found Mr. Groves guilty as charged.

*First appeal and personal restraint petition*

Mr. Groves appealed[6] and later filed a CrR 7.8 motion, which was transferred to

this court for consideration as a PRP, and the matters were consolidated.  Among other

errors, Mr. Groves contended the State violated his right to due process by failing to

disclose that Ms. Jagmin's CODIS search results indicated no match.  He argued his DNA

profile was in CODIS and the fact that the DNA from the revolver's hammer did not

match was favorable evidence.  He contended that the State's failure to disclose this fact

was a *Brady*[7] violation.

In an unpublished opinion, we rejected Mr. Groves's *Brady* argument:

> Mr. Groves fails to show that the State suppressed this evidence.  We
> acknowledge that Ms. Jagmin was acting on the State's behalf, and the State
> therefore had a duty to learn of the information she had and to promptly
> disclose it.  But there is nothing in the record to suggest that Ms. Jagmin

---

[6] No. 32961-5-III.

[7] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

11

delayed the issuance of her report to the State, or that the State withheld the
report once it received the report.

*Groves*, No. 32961-5-III, slip op. at 28.  We affirmed three of the convictions and, for

reasons unrelated to this appeal, remanded for resentencing.  *Id.* at 39.  In March 2017,

Mr. Groves was resentenced pursuant to this court's opinion.

> *Events and motions following the direct appeal*

In January 2018, Mr. Groves filed public records requests for information about

the State's testing and disclosure of the evidence in his case.  He asked the crime lab for a

detailed timeline.  Ms. Jagmin responded:

> Here is the best synopsis that I can provide to answer Mr. Groves'
> question.
> DNA analysis began 10/23/14
> Major profile from the hammer of the gun was entered into CODIS
> for search on 10/29/14 . . .
> On 10/30/14, match resulted from search, detailed in the State Match
> Detail Report . . .
> On 10/30/14, match request paperwork was submitted by Amy
> Jagmin to the CODIS laboratory to confirm the match.
> 10/31/14—reference sample of Joel Groves submitted to the
> laboratory from Ellensburg PD for DNA testing.  Testing began that day
> and the sample was completed and analyzed on 11/3/14.
> 11/3/14—the profiles of the hammer and Mr. Groves were
> compared, and a match was obtained.
> 11/4/14—CODIS laboratory returned match paperwork, confirming
> Joel Groves as the individual matched in CODIS.
> *Because I had a reference sample from Mr. Groves that was*
> *provided to me and could be reported with statistical match information,*

> *the CODIS match was no longer probative (meaning that it did not provide
> new information).* The case file report was completed on 11/5/14.
> *It is only because the reference sample from Mr. Groves was
> submitted for testing concurrent with the CODIS match information, the
> CODIS match became non-probative.*

CP at 239 (emphasis added).

Mr. Groves also asked who "casework specimen ID # 107-031507" was. CP at

187. The crime lab responded that the number belonged to him.

*Mr. Groves's second and third PRPs*

On March 29, 2018, Mr. Groves filed a second PRP with this court.[8] He also filed

a pro se motion to dismiss pursuant to CrR 7.8(b)(2) and CrR 8.3(b) in the trial court

alleging governmental misconduct, evidentiary errors, and ineffective assistance of

counsel. On April 2, 2018, over Mr. Groves's objection, the trial court transferred his pro

se motion to this court as a (third) PRP. On May 15, 2018, this court remanded the PRP

to the trial court for failing to engage in the proper CrR 7.8(c)(2) transfer analysis.

On June 1, 2018, Mr. Groves filed the pro se discovery demand that relates to this

appeal. He demanded:

> 1) The initial DNA sample, item (QQ), obtained from the hammer
> of the ruger blackhawk 357 entered into evidence on Aug. 11th, 2014 . . . .
> 2) The buccal swab sample obtained from Mr. Groves on Oct. 31st,
> 2014.

---

[8] No. 36163-2-III.

> Mr. Groves further requests that these key pieces of evidence be forwarded to Kate Sweeney of k.m.s. forensics for further independent forensic analysis.

CP at 436.

On June 29, 2018, the trial court held the CrR 7.8 hearing ordered by this court. The trial court focused on whether the motion was based on "newly discovered evidence" under CrR 7.8(b)(2), noting that many of the arguments were not related to that issue. The court asked Mr. Groves if he would like to make an oral record on the issue, to which he responded that the State failed to disclose that the swabs from the revolver were destroyed—this, he argued, was the newly discovered evidence. He conceded he was making many of the arguments he raised earlier, but argued that the new documents show the State mismanaged the evidence.

The trial court ordered the case transferred to this court as a PRP,[9] finding the evidence was not newly discovered and there was no need for an evidentiary hearing. The court noted that any claim of ineffective assistance of counsel as to the discoverable evidence was already before the Court of Appeals. The trial court concluded, "Your arguments will continue to be ripe with the Court of Appeals on the bases that you are wanting me to answer your questions as to whether that is information that would lead

---

[9] No. 35897-6-III.

14

them to either order a new trial, dismiss the charges or continue to affirm the conviction."

RP (June 29, 2018) at 39.

This court consolidated and transferred the second and third PRPs (No. 35897-6-

III; No. 36163-2-III) to the Supreme Court for review pursuant to RCW 10.73.140.  On

April 14, 2020, the Supreme Court commissioner dismissed both PRPs as frivolous.

Relevant here, the commissioner ruled that three of Mr. Groves's claims had already been

adjudicated:

> These three are that (1) the State failed to disclose material exculpatory
> evidence regarding DNA evidence; (2) the prosecutor engaged in
> misconduct by knowingly misleading the court as to the DNA evidence; and
> (3) that trial counsel was ineffective in failing to challenge this DNA
> evidence.  These issues were adjudicated in the Court of Appeals decision
> affirming the judgment and sentence and rejecting the first consolidated
> personal restraint petition, where the court held that the prosecution did not
> delay disclosing DNA evidence, that the trial court did not abuse its
> discretion in declining to exclude evidence, that the State did not suppress
> disclosure of any DNA or database evidence, and that counsel was not
> ineffective in litigating these issues or in challenging the evidence.  Again,
> Mr. Groves has not demonstrated that the interests of justice require
> relitigating these issues.

CP at 292-93 (Wash. Supreme Ct. Ruling Dismissing PRPs, *In re Pers. Restraint of*

*Groves*, Nos. 97819-1, 97979-1, at 5-6 (Apr. 14, 2020).

As for the new issue, the State's alleged failure to preserve the DNA evidence, the

commissioner ruled, "Mr. Groves fails to demonstrate factually that the State failed to

15

preserve material exculpatory evidence or that it acted in bad faith; his claim is based on

his speculation as to the nature of the DNA evidence consumed in testing." CP at 293

(Wash. Supreme Ct. Ruling Dismissing PRPs, *In re Pers. Restraint of Groves*, Nos.

97819-1, 97979-1, at 6 (Apr. 14, 2020).

*Mr. Groves's present appeal*

On July 2, 2020, Mr. Groves filed the motion underlying this appeal: a pro se

motion to dismiss pursuant to CrR 8.3(b) (governmental misconduct) and CrR 4.7

(discovery violation). He argued that he demanded discovery of the DNA sample from

the revolver's hammer in May 2018, but the State failed to produce it. He emphasized

that at the November 2018 hearing, he had again requested the sample so it could be

retested due to indications of "suspect and unreliable conclusions" in the crime lab

documents. CP at 302.

On August 27, 2020, the trial court presided over a hearing on the motion. The

State argued that the motion was procedurally barred. The trial court said it would

address the procedural issues separately, but wanted to know if the DNA sample still

existed. Ultimately, the State responded that the sample had been consumed in October

2014 during the initial testing. The trial court determined that because there was nothing

16

to produce, Mr. Groves had failed to establish a discovery violation or any misconduct by

the State.

Mr. Groves argued that the trial court was misunderstanding his motion. He

explained his motion to dismiss was based on the State's misconduct of (1) destroying the

DNA evidence from the revolver, (2) failing to report that the DNA from the hammer did

not match his state CODIS profile, and (3) violating his right to a speedy trial by requiring

him to provide a DNA sample that merely matched his state CODIS profile, not the DNA

from the hammer.

The following exchange took place:

> THE COURT: . . . So,—Mr. Groves, your motion—was to dismiss based upon—basically two arguments, deliberately withholding evidence, and—not appropriately providing discovery.
> But now it appears there wasn't any evidence to withhold because it was—consumed. So, do you agree that that renders moot your argument that—
> . . . .
> THE COURT:—evidence was withheld?
> [MR. GROVES]: Absolutely not. . . . The state knew that this wasn't me when they ran it through CODIS. . . . They pursued a buccal sample and tried to force me past speedy trial to re-test a sample that did not exist. . . .
> This is misconduct of an egregious nature. All through these proceedings, the state has done everything [it] could to delay, withhold, (inaudible), . . . just so that [it] doesn't have to answer to this question.
> I can't re-test this sample and it wasn't me. . . .

RP (Sept. 10, 2020) at 32.

17

The court explained that a declaration from Mr. Groves's defense counsel showed counsel knew about the results and chose to move forward. The court noted that the record also shows that Mr. Groves's DNA was found on the revolver. Mr. Groves vehemently disagreed. The court pointed to the report, which stated that a "'major male profile was present and matched the DNA typing profile obtained for Joel M. Groves.'" RP (Sept. 10, 2020) at 36. Mr. Groves argued that there was no match in CODIS and the additional profile should never have been needed. The court responded:

> Again, they took a swab from you, it matched what was on the gun. Whether . . . it wasn't in CODIS or they didn't find it in CODIS, that seems to me to be an evidentiary issue that—I assume was argued to the jury or could have been argued to the jury.

RP (Sept. 10, 2020) at 36. The court reminded Mr. Groves that the evidence was not withheld; his trial counsel knew about it. Mr. Groves proceeded to get more animated and eventually left the courtroom.

> The court ruled:

> I'm denying the motion made under Criminal Rule 8.3(b), I'm finding there was no misconduct. And as far as Criminal Rule 4.7 and the various sub-parts having to do with requests for discovery that were not complied with,—he didn't make a discovery request—until about three years after the trial, which was too late.
> So, his motion to dismiss is denied.

RP (Sept. 10, 2020) at 39.

18

On September 17, 2020, Mr. Groves moved for discretionary review at the

Supreme Court and also filed an appeal with this court.  Upon Mr. Groves's request, the

Supreme Court transferred the case to this court pursuant to RAP 4.2(e)(1) for

consideration by this panel.

ANALYSIS

APPEALABILITY

Generally, we decide a case only on the basis of issues set forth by the parties in

their briefing.  RAP 12.1(a).  However, if we conclude an issue not raised by the parties

should be considered, we may reach it on our own motion.  *Greengo v. Pub. Emps. Mut.*

*Ins. Co.*, 135 Wn.2d 799, 812-13, 959 P.2d 657 (1998).

CrR 4.7 and CrR 8.3 motions are interlocutory in nature and a trial court's denial

of those motions does not fit into any provision of RAP 2.2(a).  Thus, as a preliminary

matter, we consider whether the trial court's denial of Mr. Groves's CrR 8.3/CrR 4.7

motion is appealable as a matter of right.

This issue was addressed by *State v. Basra*, 10 Wn. App. 2d 279, 448 P.3d 107

(2019).  There, Basra filed a CrR 8.3(b) motion to dismiss all charges four years after he

was convicted.  *Id.* at 281.  The trial court appointed counsel and heard argument on

whether a postconviction CrR 8.3(b) motion was timely and ultimately found that it was

19

not.  *Id.* at 281-82.  Basra appealed.

We affirmed and held that the trial court's denial of a postjudgment CrR 8.3(b) motion was not appealable as a matter of right.  *Id.* at 283-84.  We reasoned that the trial court did not reach the merits of the motion and instead dismissed it as untimely.  Therefore, the order did not satisfy RAP 2.2(a)(13)'s finality requirement.  *Id.* at 284.

Here, the trial court considered the merits of Mr. Groves's untimely postconviction CrR 8.3(b) motion.  As such, the reasoning in *Basra* does not apply to the unusual circumstances of this case.  Although it is debatable whether this matter is appealable as of right, the State did not challenge appealability, and the trial court denied Mr. Groves's motion on its merits.  Accordingly, we exercise our discretion to review the appeal.

CrR 8.3 AND CrR 4.7 MOTIONS

Mr. Groves contends the trial court erred in failing to address the merits of his most recent arguments about the DNA from the hammer of the revolver.  His motion to dismiss cites CrR 8.3 and CrR 4.7.  The State argues the trial court correctly declined to grant relief based on those rules.  For the reasons set forth below, we agree with the State.

We begin by explaining why Mr. Groves's reliance on CrR 4.7 was misplaced.  CrR 4.7(h)(7)(i) provides certain remedies for discovery violations that occur "*at any time during the course of the proceedings*."  (Emphasis added.)  As the trial court correctly

observed, Mr. Groves's 2018 discovery demand was too late—it occurred three years

after his trial concluded. In postconviction proceedings such as this one, CrR 4.7

provides no relief. *See State v. Asaeli*, 17 Wn. App. 2d 697, 700, 491 P.3d 245, *review*

*denied*, 198 Wn.2d 1026, 498 P.3d 955 (2021) ("We conclude that CrR 4.7 does not apply

to postconviction proceedings. Therefore, [the defendant] had no right to file a motion

for discovery under CrR 4.7.").

Moreover, Mr. Groves's discovery demand requested production of the DNA

evidence from the revolver and his reference sample. Mr. Groves had previously

acknowledged that the swabs had been destroyed. Still, the court permitted Mr. Groves to

raise the issue and conclusively determined that the State did not violate discovery rules

as there was no evidence it could have produced in response to Mr. Groves's (untimely)

demand in 2018.

We move on to Mr. Groves's reliance on CrR 8.3(b), which was similarly

misplaced. Under the rule:

> The court, in the furtherance of justice, after notice and hearing, may
> dismiss any criminal prosecution due to arbitrary action or governmental
> misconduct when there has been prejudice to the rights of the accused
> which materially affect the accused's right to a fair trial.

CrR 8.3(b).

We review a trial court's rulings on CrR 8.3(b) for abuse of discretion. *State v. Garza*, 99 Wn. App. 291, 295, 994 P.2d 868, *review denied*, 141 Wn.2d 1014, 10 P.3d 1072 (2000). A trial court abuses its discretion when its decision is based on untenable grounds or made for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Like CrR 4.7, CrR 8.3 applies to ongoing criminal prosecutions. Dismissal under CrR 8.3(b) is not intended to be available postjudgment. *See Basra*, 10 Wn. App. 2d at 286 ("A criminal prosecution is no longer ongoing postjudgment and therefore is not subject to dismissal under CrR 8.3(b)."). Mr. Groves filed his CrR 8.3(b) motion years after his prosecution ended; the State pointed this out in its response to Mr. Groves's motion. Still, the trial court considered the merits of the motion, and we proceed to do the same.

To prevail on a CrR 8.3(b) motion to dismiss, the defendant bears the burden of proving both (1) arbitrary action or governmental misconduct and (2) actual prejudice affecting his right to a fair trial. *State v. Williams*, 193 Wn. App. 906, 909, 373 P.3d 353 (2016). "No amount of prejudice can sustain a dismissal order if the defendant is unable to establish arbitrary action or misconduct." *Id.* (citing *State v. Michielli*, 132 Wn.2d 229, 240, 937 P.2d 587 (1997)). Misconduct justifying dismissal may encompass "simple

22

mismanagement" as well as "evil or dishonest" conduct. *Garza*, 99 Wn. App. at 295.

Because dismissal "'is an extraordinary remedy,'" it requires some sort of wrongdoing.

*Williams*, 193 Wn. App. at 910 (quoting *State v. Moen*, 150 Wn.2d 221, 226, 76 P.3d 721

(2003)).

*Arbitrary action or misconduct*

Mr. Groves identifies misconduct in (1) the "inconsistency" in the DNA analysis

and disclosure, and (2) the State's insistence on obtaining a buccal swab and delaying trial

when it knew the DNA from the revolver had already been destroyed. Neither of these

allegations are proof of misconduct and the trial court did not abuse its discretion in so

ruling.

To best address Mr. Groves's arguments, we briefly explain how DNA testing and

CODIS matching work, as it is not clear from the record or briefing. The Federal Bureau

of Investigation (FBI) has identified 13 core STR loci in DNA that contain the genetic

material most easily comparable to differentiate among and identify individuals. *See*

Karen Norrgard, *Forensics, DNA Fingerprinting, and CODIS*, NATURE EDUCATION

(2008), https://www.nature.com/scitable/topicpage/forensics-dna-fingerprinting-and-

codis-736/. When the 13 STR loci in a DNA profile generated from physical evidence

match the 13 STR loci in an individual's DNA profile, then a statistical calculation is

23

made to determine the frequency of such a match in the population.

CODIS helps law enforcement compare a target DNA record against the DNA

records contained in the database:

> Once a match is identified by the CODIS software, the laboratories involved in the match exchange information to verify the match and establish coordination between their two agencies. The match of the forensic DNA record against the DNA record in the database may be used to establish probable cause to obtain an evidentiary DNA sample from the suspect. The law enforcement agency can use this documentation to obtain a court order authorizing the collection of a known biological reference sample from the offender. The casework laboratory can then perform a DNA analysis on the known biological sample so that this analysis can be presented as evidence in court.

*Frequently Asked Questions on CODIS and NDIS*, FEDERAL BUREAU OF INVESTIGATION,

https://www.fbi.gov/services/laboratory/biometric-analysis/codis/codis-and-ndis-fact-

sheet (last visited _____).

Thus, an initial match in CODIS is the first step, permitting the collection of a

buccal swab or other sample from the suspect that can be compared directly to the DNA

profile generated from the physical evidence at the scene. *See State v. McConnell*, 178

Wn. App. 592, 605, 315 P.3d 586 (2013) (to determine whether a match *conclusively*

*establishes* identity of a suspect, an unknown DNA profile must be compared with a

known DNA profile); *State v. Garcia-Salgado*, 170 Wn.2d 176, 184-87, 240 P.3d 153

24

(2010) (explaining the practice and requirements for obtaining DNA from a suspect to compare with DNA evidence from crime scene); *see also State v. Lui*, 179 Wn.2d 457, 465-66, 315 P.3d 493 (2014) (samples from victim's shoelaces and body were tested against DNA taken from several suspects in case).

From our record, we know the following facts: (1) on October 29, 2014, the crime lab entered a DNA profile from the revolver's hammer into the state CODIS system, (2) on October 30, CODIS identified a matching profile and Ms. Jagmin requested a confirmation, (3) on October 31, two buccal swabs were obtained from Mr. Groves and sent to the crime lab where testing began that day, (4) on November 3, the crime lab completed testing on Mr. Groves's buccal swabs, compared it to the profile of the DNA on the hammer, and found a match, (5) on November 4, the crime lab confirmed that the DNA on the revolver's hammer matched Mr. Groves's CODIS offender profile, and (6) on November 5, Ms. Jagmin completed and submitted a case file report relaying the above information.

Mr. Groves contends there was an "inconsistency" in the DNA analysis and disclosure because Ms. Jagmin's report remarks that the major DNA profile on the revolver's hammer was uploaded to CODIS and "no probative matches resulted" although his DNA was in CODIS. CP at 237. But Ms. Jagmin since explained that Mr. Groves's

reference sample conclusively matched the DNA from the revolver's hammer "and could be reported with statistical match information, [*so*] *the CODIS match was no longer probative (meaning that it did not provide new information).*"  CP at 239 (emphasis added).

Mr. Groves next contends the State insisted on obtaining a buccal swab (reference sample) and delaying trial when it knew the DNA from the revolver had already been destroyed.  This builds on his prior allegations of *Brady* violations, which he raised on direct appeal, for which we found no support in the record.  Mr. Groves has now had a chance to develop a record on this claim, but put simply, there is still no support.

Mr. Groves has not shown that the State knew the swabs from the revolver's hammer had been destroyed when it asked for a reference sample.  But even if it knew this, it properly compared the *results* of the DNA testing from the revolver's hammer to the DNA obtained from Mr. Groves.  As explained above, this is the appropriate process for establishing a DNA match to present at trial.

*Actual prejudice*

In the interest of fully adjudicating Mr. Groves's claims, which he argues have never been addressed on their merits, we briefly address prejudice.  Mr. Groves has not (and cannot) show how any of the alleged misconduct caused actual prejudice to his right

to a fair trial. The fact his DNA profile matched his offender state CODIS profile is cumulative evidence of his guilt, not exculpatory evidence.

We conclude that the trial court did not err in denying Mr. Groves's motion to dismiss pursuant to CrR 8.3(b), as he failed to prove misconduct and actual prejudice.

CrR 7.8 MOTION

Mr. Groves contends that, to the extent the trial court deemed his claims untimely, it should have transferred the motion to this court as a PRP. He also argues the court abused its discretion in artificially narrowing the issues before it, thereby depriving him of a fair hearing on the merits. We disagree.

We begin by noting that Mr. Groves is familiar with postconviction motions. Indeed, he has filed several motions that have been transferred to this court—and the Supreme Court—for consideration as PRPs. It is unclear why he chose to file a CrR 8.3 motion in his most recent effort, but we presume this was intentional. The trial court was not required to consider his CrR 8.3 motion as a CrR 7.8 motion, nor are we. Still, because we want to make clear that our opinion is not an invitation for Mr. Groves to continue litigating these issues, we proceed to address CrR 7.8.

Under the criminal rules,

27

> The court shall transfer a motion filed by a defendant to the Court
> of Appeals for consideration as a personal restraint petition unless the court
> determines that the motion is not barred by RCW 10.73.090 and either
> (i) the defendant has made a substantial showing that he or she is entitled to
> relief or (ii) resolution of the motion will require a factual hearing.

CrR 7.8(c)(2).

"In other words, only if the motion is timely and appears to have merit or requires fact finding should the superior court retain and hear it; in all other cases, the motion is transferred to this court." *State v. Robinson*, 193 Wn. App. 215, 218, 374 P.3d 175 (2016). We review a trial court's ruling on a CrR 7.8(c)(2) motion for abuse of discretion. *Id.* at 217. Under this deferential standard, we do not reverse unless the decision was manifestly unreasonable or based on untenable grounds. *Id.* at 217-18.

We first address Mr. Groves's contention that the trial court "refused to consider any of Mr. Groves's other claims because they were untimely." *See* Appellant's Br. at 28. This is not true. Instead, the court indicated that any argument regarding the probative value of the CODIS match, or lack thereof, versus the reference sample match, should have been made to the jury. *See State v. Fernandez-Medina*, 141 Wn.2d 448, 460, 6 P.3d 1150 (2000) ("[T]he finder of fact is the sole and exclusive judge of the evidence [and] the weight to be given thereto . . . ."). Mr. Groves had incomplete information about the

DNA analysis at trial because he chose to proceed rather than investigate further. Still, the court did not rule that the claim was time barred.

We next turn to the trial court's comment that Mr. Groves "didn't make a discovery request—until about three years after the trial, which was too late." RP (Sept. 10, 2020) at 39. This is not a ruling that Mr. Groves's motion was time barred. As discussed above, CrR 4.7 motions are not available postconviction and, moreover, there was no discovery violation.

## CONCLUSION

Mr. Groves's motion to dismiss is based on a misunderstanding of the DNA evidence and procedures. First, the major DNA profile from the revolver's hammer matched his state CODIS profile. Second, the State's insistence of a DNA sample from him was a necessary procedure to ensure that the major DNA profile from the revolver's hammer was his DNA. Third, the State matched the DNA sample it took from him to the DNA from the hammer. Correctly understood, it is evident that Mr. Groves received a fair trial and the major DNA profile from the revolver's hammer is his DNA.

No. 37927-2-III
*State v. Groves*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____        _____
Siddoway, C.J.                          Cooney, J.P.T.